## RICHARDSON et al. v. LOWE et al.

(Circuit Court of Appeals, Eighth Circuit. October 23, 1906.)

No. 2,242.

1. CONTRACT—RESCISSION FOR FRAUD—TIME FOR EXERCISE OF RIGHT AND CONDITIONS REQUISITE THERETO.

The right to rescind a contract for misrepresentation and fraud must be exercised immediately upon discovery of the fraud, or of sufficient evidence thereof to reasonably warrant such action. The intention to rescind must be manifested by some notice or outward manifestation thereof which will apprise the other party of such intention, and the party entitled to rescind must not vacillate in his purpose, but must consistently adhere to it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 1189.]

2. VENDOR AND PURCHASER—RESCISSION BY PURCHASER—WAIVER OF RIGHT BY LACHES.

Defendants purchased a group of mines that were being worked and at once took possession. Within four months thereafter they claimed to have learned that material misrepresentations had been made by the vendors as to the value and richness of the mines but continued to operate the same both for development and production for two years and until long after suit had been commenced by the vendors to foreclose a mortgage given to secure a note for purchase money, in which they answered setting up the fraud and also filed a cross-bill for rescission, no notice of the intention to rescind having been given to the vendors until the filing of such answer some five months after the fraud was discovered. *Held*, that by such laches they waived and irrevocably lost the right to rescind.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, §§ 212–214.]

3. SAME—ACTION FOR PURCHASE MONEY—DEFENSE OF FRAUD.

Although fraud inducing a purchase of property has been waived by laches as a ground for rescission of the contract, yet the purchaser may plead the resulting damages as a failure of consideration in defense of a note given for purchase money, provided he has fully performed on his part.

4. SAME—ACTION FOR PURCHASE MONEY—COUNTERCLAIM FOR DAMAGES ON ACCOUNT OF FRAUD.

If the fraud inducing a purchase of property has been waived by laches as a ground for rescission of the contract, and the vendee has not fully performed on his part, he may not, with full knowledge of the vitiating fraud, continue performance, voluntarily subjecting himself to damage, and afterwards recover therefor.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, § 30.]

5. MORTGAGES—SECURITY FOR PURCHASE MONEY—FORECLOSURE—DEFENSES—FRAUD—CROSS-BILL FOR RESCISSION.

In a suit in equity to foreclose a mortgage given to secure a note for purchase money of property, an answer setting up fraud inducing the sale in defense to the note and a cross-bill for rescission of the contract on account of the same fraud are not inconsistent.

6. VENDOR AND PURCHASER—ACTION FOR PURCHASE MONEY—DEFENSES—FRAUD—PROOF OF DAMAGES.

Where a purchaser of property in defense to a note given for purchase money sets up fraud in the sale, the burden rests upon him to prove that the property was worth less than the price agreed to be paid, and how much less, and where the property consisted of mines the value of which cannot be accurately determined, and is largely speculative a finding by the trial court on conflicting evidence, that such burden has not been sustained by the proof of any damages will not be disturbed on appeal.

149 F.—40

7. EQUITY—BILL OF REVIEW—NEWLY DISCOVERED EVIDENCE.

   Leave to file a bill of review on the ground of newly discovered evidence will not be granted, where such evidence is merely cumulative on issues joined and tried in the case or where it is immaterial to the issues upon which the case was decided.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, § 1092.]

Appeal from the Circuit Court of the United States for the District of Colorado.

This was a bill to foreclose a mortgage executed by Arthur J. Richardson and E. Jennie H. Richardson, defendants below, to secure the payment of a note for $182,500 made by them and payable to the order of Henry B. Lowe and Tyson S. Dines, complainants below. The property mortgaged consists of a number of mining claims known as the "Topeka Group" of mines located in Gilpin county, Colo. Defendants admitted the execution of the note and mortgage, and set up as a defense that the note was given to represent part payment of the purchase price of the mines which they had bought from complainants; that the mines were worthless and known to have been so by complainants when they made the sale; that they were induced to make the purchase by fraud, deceit, and misrepresentation practiced upon them by complainants and for these reasons the note was without consideration and void. Defendants also filed a cross-bill, setting forth the transaction culminating in the purchase of the mines, the false representations made by complainants concerning their values, the fraud practiced by complainants to induce them to make the purchase, payment of one-half of the purchase price by them, a rescission of the contract on the discovery of the fraud and other facts which will be sufficiently referred to later, and prayed that the note and mortgage be canceled, that complainants be decreed to restore to defendants $162,500, the cash payment made for the mines, and to retake title and possession thereof. On these issues the case was heard by the Circuit Court and decided in favor of complainants on their bill of foreclosure and against defendants on the issues presented both by their answer and cross-bill. Defendants appeal.

Charles S. Thomas and William H. Bryant (William P. Malburn, and Don M. Dickinson, on the brief), for appellants.

Charles J. Hughes, Jr., and O. L. Dines (E. E. Whitted, on the brief), for appellees.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The defendants, Mrs. Richardson and her son Arthur, were residents of Erie county, N. Y., and on the death of the husband and father, some 10 years before the events of this suit, became possessed of a large estate which enabled them to make transactions of their own, and which required of them the exercise of business sagacity and management. The mother was co-trustee with one Lindsay in the active management of her late husband's estate and had had considerable experience in mining deals in Wyoming and Colorado. The son was in the prime of young manhood, 23 years of age, and had dealt in mines in Colorado, Wyoming, and Michigan. They both appear by the record to have been fairly sensible and prudent persons. The complainants, Lowe and Dines, were the owners of the Topeka Group of mines, and resided in Denver, Colo. Lowe had the chief management and control of the transaction, which resulted in the sale of the mines to the defendants.

The alleged fraudulent and false representations mainly relied upon by defendants to secure a rescission of the contract of sale are: (1) the pretension that Lowe was obliged to undergo a dangerous and possibly fatal surgical operation which induced him to sell a mine of wonderful richness below its actual value; (2) the pretension that certain parties denominated the "Boston Parties" were clamoring for the property at the same price he was offering it to defendants; (3) the representations that the mines were of great richness and value as disclosed in certain engineers' reports submitted to defendants to induce them to make the purchase; (4) the representations that the mines were of great value and that the ore in sight was extensive and valuable as stated by Lowe and his agents orally to the defendants. As further ground for rescission it is claimed that there was a suppression of information concerning the expenses of operating the mines and that Lowe corrupted one Townsend while he was acting as the agent or associate of defendants in the purchase by offering and finally paying to him a commission to bring about the sale.

The questions whether the representations specified were made or whether if made they were material or of that sort upon which defendants might rely or whether they were in fact false or whether information was suppressed or whether Townsend was corrupted all received much attention in proof and argument and might afford interesting subjects for discussion, but in the view we take of the question of waiver of the fraud by failure to exercise due diligence to rescind, those questions, so far as the rescission of the contract is concerned, do not require consideration at our hands, and we accordingly refrain from so doing and proceed to a consideration of the evidence relating to the time when defendants acquired knowledge of the alleged falsity of the representations and reports concerning the character and value of the mines and the other alleged fraudulent conduct of Lowe. The proof discloses that defendants took possession of the mines with Townsend acting as their superintendent or general manager immediately on the consummation of the purchase, October 27, 1899; that they found soon after taking possession that the rich free gold which had been represented to be in a stope known as the Klondike stope was not there; that as early as December, 1899, they suspected that Townsend had received a commission from Lowe; that some time in January, 1900, they believed the reports and statements concerning the character and value of the mines upon which they claim to have relied in making the purchase were untrue. On February 24, 1900, according to the averments of the cross-bill and amended cross-bill of Arthur Richardson he and his mother had ascertained the fraudulent character of the transaction and rescinded the contract; he avers "that they have never from that time to this acknowledged in any way, shape or form that said note was binding upon them, but they have repudiated the entire transaction and they now repudiate the same." On that day Townsend was discharged as superintendent and one Nichols substituted in his place. On May 12, 1900, this foreclosure suit was instituted. On July 2, 1900, both Arthur Richardson and Mrs. Richardson filed

answers and cross-bills for relief on the ground of fraud. On November 28, 1900, Arthur filed an amended cross-bill and on a later date Mrs. Richardson filed a like amended cross-bill. From the foregoing we conclude that defendants discovered the fraud, if any there was, as early as February, 1900. Upon such discovery their rights and duties became clear. They had two remedies, one was to rescind the contract by reason of the fraud and the other to affirm the contract notwithstanding the fraud. If they proposed to rescind, their duty was to assert that right promptly, unconditionally and unevasively, otherwise the affirmation of the contract, notwithstanding the fraud, would follow.

In Grymes v. Sanders, 93 U. S. 55, 62, 23 L. Ed. 798, the Supreme Court by Mr. Justice Swayne stated the rule thus:

"Where a party desires to rescind upon the ground of mistake or fraud he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted."

In Shappiro v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419, the Supreme Court by Mr. Justice Day says:

"It is well settled by repeated decisions of this court that where a party desires to rescind upon the ground of misrepresentation or fraud, he must upon the discovery of the fraud announce his purpose and adhere to it [citing Grymes v. Sanders]. If he continues to treat the property as his own the right of rescission is gone, and the party will be held bound by the contract. * * * If he choose the latter remedy [rescission] he must act promptly—announce his purpose and adhere to it, and not by acts of ownership continue to assert right and title over the property as though it belonged to him."

This court, in Burnes v. Burnes, 70 C. C. A. 357, 137 Fed. 781, and Burk v. Johnson (C. C. A.) 146 Fed. 209, citing many authorities in support, announced the same doctrine. These, without citing other well-known cases to the same point, sufficiently affirm the proposition that defendants upon discovering complainants' fraud had an instant duty to perform. If they would repudiate the contract by reason of that fraud they should thereafter have treated the property as they would have done the property of complainants found in their possession and not as their own property. How did defendants' conduct square with this well-settled rule of law? They employed Nichols to succeed Townsend as superintendent and general manager of the mine, and notwithstanding they claimed to have rescinded the contract on that day, they authorized him to do the best he could with the mines, and to work them to the best advantage. Nichols remained as superintendent until November, 1899, and says in his testimony that he worked the mines to the best advantage. The proof shows no substantial change in mining operations after the alleged rescission. Nichols kept right on with development work, practically as Townsend had done, drifting, cross-cutting, stoping, upraising, breaking down, and shipping ore and selling the same until November, when he resigned and was succeeded by one Beals, who, under Arthur Richardson's direction, drove levels and did other development work until

December, 1901. In May and June after the alleged rescission Nichols leased to numerous miners various parts of the mine for operation on shares, and so far as we can discover from the voluminous record before us the mines were worked both for development and producing purposes in the spirit of the instructions given Nichols when he succeeded Townsend as superintendent. In that part of appellants' brief where counsel discuss the value of the mine they well sum up the character of the operations after the time appellants discovered the alleged fraud and after the alleged rescission as follows:

"In February, 1900, he [Townsend] was summarily removed as manager and his connection with the appellants was thereby permanently ended. One John Nichols, an old experienced and competent miner was installed as manager in his stead, who, for months thereafter, and until October, 1900, vainly sought to locate and exploit the marvelous bodies of ore recounted in the reports of Mr. Lowe's experts and by his own representations."

The exploitation and operation of the mines as shown by the record not only after the admitted knowledge of the fraud, but after the defendants had pleaded it as a ground of rescission of the contract of purchase are totally inconsistent with the right of rescission. They evince a continued ownership and interest in the mines rather than a repudiation of the contract and a holding of the mines for the benefit of the vendors, and afford conclusive evidence that the vendees waived the fraud and affirmed the contract of purchase. Counsel for the vendees seek to avoid this result by claiming: (1) That the vendees were entitled to a lien on the mines to secure the repayment of the first installment of purchase money paid by them; (2) that the work on the mines was done pending negotiations for a settlement; (3) that the work was done to secure evidence of the worthlessness of the mines.

It may be conceded that the vendees might in case of success in their suit for rescission be decreed to have a lien on the property sold for the amount of their cash payment, and also that the vendees might have been justified in taking samples of ore and making reasonable experiments with the mines for the purpose of securing proof for use in the pending litigation, but neither of these concessions avail them for the present purpose. If they were entitled to hold possession to preserve their lien they would clearly be entitled to do such acts and such acts only as were reasonably necessary for and consistent with that purpose. Any other or further acts would be manifestly for some other purpose. Likewise, if they might take samples and otherwise prepare evidence for the trial, only such samples and other experimental work as would reasonably subserve that purpose would be justified. But neither of these purposes, in our opinion, required the breaking down, shipping and selling of ore, running levels and making cross-cuts and other acts of development and prospecting shown by the proof in this case. The vendees obviously had some other purpose in doing all this work, and it must, in our opinion, be referred to their own interests as owners of the mines which they had purchased and which they had determined to keep, notwithstanding any frauds practiced upon them by the vendors.

Again it is urged that the work was done on the mines pending

negotiations of settlement of the controversy between the parties and was therefore excusable. This excuse, in our opinion, is without merit. A careful examination of the record fails to disclose any attempt to settle the controversy presented by the pleadings in this case. As early as November 4, 1899, the subject of securing an extension of the time for making the second payment for the mines arose. In a letter from Mr. Lindsay (co-trustee with Mrs. Richardson of her late husband's estate) addressed to Mr. Lowe he says amongst other things:

"It would probably not inconvenience you to divide this second payment of $182,500 into 10 equal payments of $18,250, one to be paid December 12th next, and one on the 12th of each succeeding month; the last being paid in nine months from December 12th, each note bearing interest at 6 per cent. per annum. Had such an arrangement been originally made you would have deemed it reasonable, and you will also, I think, concede that the amounts of payment and dates of same were acceded to by the purchasers without mature reflection. Your consent to this plan will give us the needed time in which to provide for the payment * * * etc."

The proof shows that the purchasers did not have the ready money to make payment of the second installment; that they had expected to pay it out of the earnings of the mines or the sale of stocks belonging to their deceased ancestor's estate. Being disappointed in getting the money from these sources efforts to secure extensions of time in which to make the final payment were from time to time made, and these efforts, which we understand recognized the obligation of the purchasers to make the payment in full, seem from the proof to be the only negotiations to which general reference is made in the pleadings. No demand seems to have been made by the vendees for damages sustained by misrepresentation or fraud in bringing about the contract, and we discover no negotiations for the settlement of any such demand. In making the foregoing statement we confine ourselves to time antecedent to filing the cross-bills by defendants. We recognize that there is some evidence of an attempt at compromising, begun a long time after the case was at issue, in June, 1901, but such negotiations manifestly afford no ground for excusing defendants' prior conduct. As a further and conclusive answer to the contention that the vendees' conduct was excused by the pendency of negotiations for a settlement, attention is called to the fact that the operation of the mines by the vendees continued after the bill for foreclosure was filed and after the first answers and cross-bills were filed thereto for several months at least, practically the same as before. As a result of a most careful and painstaking consideration of the conduct of the vendees after February 24, 1900, as disclosed by the proof, we confidently assert that the purpose to rescind the contract by reason of the frauds alleged was never entertained by the defendants until they filed their answers and cross-bills in July, 1900. We find no evidence until then of any notice to complainants of such purpose. Up to that time they were silent and for months afterwards they exercised many acts of absolute ownership. They planned for and executed schemes for further development of the mines totally inconsistent with their present pretension of having repudiated their contract of purchase on February 24th. Rescission of a contract on the ground of fraud is not a mental process undis-

closed and unacted upon. It requires affirmative action immediately on its discovery; some overt act and outward manifestation of the intention to clearly apprise the other party to the contract of the right asserted. Melton v. Smith, 65 Mo. 325; Walters v. Miller, 10 Iowa, 427. No case has been brought to our attention which presents a clearer illustration of the doctrine of waiver of fraud and election to abide by the contract as made than this. The following cases afford apt and persuasive authority for the application of the doctrine to this case: Romanoff Mining Co. v. Cameron, 137 Ala. 214, 33 South. 864; Shiffer v. Dietz, 83 N. Y. 300; Booth v. Ryan, 31 Wis. 45; Greenwood v. Fenn, 136 Ill. 146, 26 N. E. 487; Dennis v. Jones, 44 N. J. Eq. 513, 14 Atl. 913, 6 Am. St. Rep. 899; Downer v. Smith, 32 Vt. 1, 76 Am. Dec. 148. The duty of rescinding arises immediately upon acquiring knowledge of the substantial and material facts constituting the fraud. It is not requisite that the defrauded party shall be acquainted with all the evidence constituting the fraud before the duty to act by way of rescission arises. Campbell v. Flemming, 1 A. & E. 40; Fry on Specific Performance of Contracts (2d Ed.) §§ 703, 704; Bach v. Tuch, 126 N. Y. 53, 26 N. E. 1019; Taylor v. Short, 107 Mo. 384, 17 S. W. 970. When he has evidence sufficient to reasonably actuate him to rescind the contract and on which he has once acted no subsequent discovery of cumulative evidence can operate to excuse waiver of the fraud if one has in the meantime occurred or to revive a once lost right of rescission. The election to waive the fraud once deliberately made is irrevocable. Vacillation or speculation cannot be tolerated. See cases supra.

In the view we have taken of the question already discussed, we find no occasion for considering or determining the interesting questions discussed by counsel touching the effect of a failure to restore or offer to restore the property conveyed before suit was brought or the inability at the time the issues were made up or the case tried to place the vendors in statu quo. The election to affirm the contract notwithstanding the fraud renders a discussion of these questions unnecessary. The further question requiring attention relates to the issue of failure of consideration of the note which affords the foundation of complainants' foreclosure suit, raised by defendants' answers. These answers charge that complainants concocted a scheme to cheat and defraud the defendants out of $365,000 in money without giving them any consideration therefor, and to that end that the complainants made the alleged false representations, statements and reports concerning the value of the mines, which have already been considered in the forepart of this opinion; that defendants in reliance upon them were induced to make the contract obligating themselves to pay $365,000 for the mines and to execute in part payment thereof the note in question. They further allege that the mines were practically worthless, and that by reason of these facts there was no consideration for the note in question or that the consideration failed.

Counsel for complainants first contend that the same fraud on which the cross-bill for recission was based is made the basis of this defense, and as that fraud was so waived as to prevent recission, the conse-

quences of it cannot be availed of on the plea of failure of consideration. to diminish the amount due on the note secured by the mortgage. If the contract at the time of the discovery of the fraud were executory this contention would be sound. The vendees, with full knowledge of the vitiating fraud would not be permitted to go on and perform the contract, voluntarily subjecting themselves to damages, and afterwards to sue for and recover the same. Their waiver of the fraud by such performance of the contract would doubtless be for all purposes and would bind them to the contract in like manner as they would have been bound if the falsity of the representations had been known and fully understood before the execution of the contract. The waiver after knowledge of the fraud constitutes full affirmation and ratification of the contract, notwithstanding the fraud.

In Simon v. Goodyear Metallic Rubber Shoe Co., 44 C. C. A. 612, 105 Fed. 573, 579, 52 L. R. A. 745, Judge Lurton speaking for the Circuit Court of Appeals for the Sixth Circuit says:

"If the fraud be discovered while the contract is wholly executory, the party defrauded has the option of going on with it or not, as he chooses. If he executes it, the loss happens from such voluntary execution, and he cannot recover for loss which he deliberately elected to incur."

So in Kingman v. Stoddard, 29 C. C. A. 413, 85 Fed. 740, where this subject is considered in the light of the authorities a palpable distinction is made between the effect of waiving a fraud before and after the performance of a contract induced by it. The reason for nonliability in cases where the vendee has, with knowledge of it, waived the fraud before the performance of the contract has no application to a case like that now before us. Here the vendees had fully performed their contract, paid for and taken possession of the mines purchased, expended about $75,000 in equipping them with new machinery and had conducted much exploration work prior to the discovery of the alleged fraud. To hold in such a case that because of a state of facts which prevents total rescission of the contract there can be no recovery for the deceit would, in our opinion, deny a well-recognized remedy to the injured party. But it is said that damages occasioned by the fraud and deceit cannot be recovered by defendants on a plea of failure of consideration for the note given. This is not so. The note was given for a thing supposed to be of value and was so represented by complainants. If it had no value and the representations were material, false and relied upon there was no consideration for the note and complainants ought to have no relief by reason of the note. The consequence of the fraud and deceit may be availed of to defeat in toto the complainants' right of action on the note or if the same occasioned only a partial diminution of the value, in mitigation of damages. Withers v. Greene, 9 How. (U. S.) 213, 13 L. Ed. 109; Van Buren v. Digges, 11 How. (U. S.) 461, 13 L. Ed. 771; Zimpelman v. Hipwell, 4 C. C. A. 609, 54 Fed. 848; Boggs v. Wann (C. C.) 58 Fed. 681; Rotan v. Nichols, 22 Ark. 247.

Again it is urged that the two defenses based on the alleged fraud, the failure of consideration for the note and rescission of the contract are inconsistent defenses and cannot both stand. The same facts are

pleaded in both defenses and the two different theories are undoubtedly presented by counsel out of abundant precaution to present some theory of law to warrant relief on the facts as they might turn out to be. If the facts should justify a recission the relief would be greater than if only a diminution of damages could be awarded.

In Daniell's Ch. Pl. & Pr., vol. 1, *page 713, the author lays down the following rule:

"A defendant may, by his answer, set up any number of defenses, as the consequence of the same state of facts, which his case will allow, or the ingenuity of his legal advisers may suggest."

Chancellor Wolworth, in Hopper v. Hopper, 11 Paige Ch. (N. Y.) 46, says:

"A defendant in this court in an answer may set up as many defenses as he pleases. The different parts of his answer, therefore, are not to be construed in the same manner as the different parts of a plea would be in this court, or even in a court of law. * * * He cannot set up two distinct defenses therein which are so inconsistent with each other that if the matters constituting one defense are truly stated the matters upon which the other defense is attempted to be based must necessarily be untrue in point of fact."

This, as we understand, lays down the test to be whether the facts pleaded in the different defenses can or cannot physically coexist. Tested by the rule indicated in the foregoing authorities there can be no doubt that in this equitable proceeding the answer and the cross-bill are consistent. There might well coexist facts warranting the vendees in exercising the right of rescission which, if they waived, might also entitle them to damages. The exigencies of the trial alone might determine which would be most available to the defendant.

Woods, Circuit Judge, later Associate Justice of the Supreme Court, in the case of Hicks v. Jennings (C. C.) 4 Fed. 855, dealt with a similar question and took occasion to say:

"A court of equity would not allow a decree upon the note and mortgage in suit and then turn the defendant over to another suit to recover the amount out of which he had been wronged by the fraud and falsehood of the complainant. Having the parties before it, it would adjust the controversies between them springing out of the same transaction, according to equity and good conscience."

Reference to that opinion discloses that Judge Woods recognized as this court has done in Wilson v. New United States Cattle Ranch Co., 20 C. C. A. 244, 73 Fed. 994, a difference between the rule applicable to an action in a court of law as distinguished from a proceeding in equity. Having disposed of these preliminary questions we are now brought to the question of fact. Assuming, but not deciding, that complainants were guilty of the false representations, deceit or fraud complained of, were the defendants damaged thereby? If so in what amount?

The measure of damages, if any, in cases of this kind, is the difference between what the vendees parted with and the actual value of what they received. Stratton's Independence Limited v. Dines, 135 Fed. 449, 68 C. C. A. 161 and cases there cited. The burden was on defendants to prove not only that the mines which they received were of less value than $365,000 which they paid for them, but to prove how

much less was their value. They made their proof as best they could and have brought to this court the record on this subject, and on this record we are asked to find and decree that the note was without consideration in whole or in part and if in part, what part. Can we do so? The property which we are asked to value and say how much, if anything, less than $365,000 it was worth in 1899 consists of several mining claims partially developed, and which during seven or eight years before 1899 had produced the average value of $9 to $11 per ton. This property, from its nature, is of doubtful and uncertain value. No one can peer into the bowels of the earth and tell us with accuracy what is found there. It is so difficult to determine even the quantity and value of ore in sight that the Supreme Court in Southern Development Co. v. Silva, 125 U. S. 247, 252, 8 Sup. Ct. 883, 31 L. Ed. 678, says:

"It is at best a mere matter of opinion. It cannot be calculated with mathematical or even with approximate certainty. The opinions of expert miners, on a question of this kind, might reasonably differ quite materially."

These observations are made by the Supreme Court concerning an estimate of ore actually "in sight" as that term is understood among miners. But that court in the same case goes further, and, quoting with approval from Tuck v. Downing, 76 Ill. 71, 94, says:

"No man, however scientific he may be, could certainly state how a mine, with the most flattering outcrop or blowout, will finally turn out. It is to be fully tested and worked by men of skill and judgment. Mines are not purchased and sold on a warranty, but on the prospect. The sight' determines the purchase. If very flattering, a party is willing to pay largely for the chance. There is no other sensible or known mode of selling this kind of property. It is, in the nature of things, utterly speculative, and every one knows the business is of the most fluctuating and hazardous character. How many mines have not sustained the hopes created by their outcrop."

From such approved reflections concerning the character of the property which defendants purchased, and which we are now asked to say was worth less than they paid for it we find that we are dealing with a subject uncertain in actual value, and which, from the speculative feature involved in dealing in it, becomes almost impossible to accurately value. Notwithstanding these difficulties, we have given the testimony on both sides our most careful consideration.

The defendants introduced a dozen witnesses or more, some of whom qualified as experts and some did not, some of whom testified concerning their observation and experience in the mines, and some of whom testified to taking samples of ore from the mines, which were afterwards assayed. These experts and witnesses generally testified concerning the condition of the mines as they appeared after the defendants took possession in the fall of 1899 and during the summer of 1900. The general tendency of their testimony shows that the mines were of little or no value. The methods resorted to in securing the samples and the results indicated by them are characterized as unfair and unreliable by complainants' counsel. Complainants introduced an equal or greater number of witnesses in support of their contention touching the value of the mines. They produced experts who claimed to have made recent exhaustive and accurate examinations of the mines and found them to be of great value. They introduced

miners who had worked in the mines both before and after defendants took possession who gave evidence tending to show the continued existence of a good mine. Considering the great volume of this evidence, the mass of detail found in it, the irreconcilable and contradictory statements of witnesses as well as the uncertainty of inference to be drawn from the facts, we find ourselves unable to say that the mines in question were worth less than the amount paid for them, and much more are we unable to say how much less they were worth. Any conclusion on this subject rests largely upon conjecture and surmise, and these we cannot indulge. The defendants upon whom the burden rested have failed to satisfactorily show how much, if anything, should be allowed them as damages for the fraud and deceit charged by them.

Judge Hallett, who tried this case in the Circuit Court, is a man of great experience in the trial of mining cases and his findings on conflicting evidence are not only presumptively correct (Stearns-Roger Mfg. Co. v. Brown, 52 C. C. A. 559, 114 Fed. 939), but specially appreciated by us in this case. Speaking of the value of ore in the mines at the time of the sale, and specially of the proof of the defendants tending to show that complainants' representations as to value were false, he makes use of the following language:

"The respondents rely mainly upon the work which they did in the premises and the results which they obtained from getting the ore treated to show that the representations were in the first place false. I do not believe that this affords a fair test; at all events, the testimony on that point is met by a very considerable volume of testimony on the other side as to the previous yield of the mine and it leaves the whole subject in doubt, so that it cannot be said that the facts are established."

Unless we are prepared to say that the learned judge made a serious mistake in his consideration of the facts we ought not to disturb the conclusion reached by him. Stearns-Roger Mfg. Co. v. Brown, supra, and cases cited.

It results from what has been said that the decree below was for the right party, and it is therefore affirmed.

PER CURIAM. The motion filed in this case by appellants for leave to file in the court below a bill of review on the ground of newly discovered evidence must be denied for two reasons: First, the alleged newly discovered evidence, after a careful examination of the motion and proposed bill and supporting affidavits, is found to be corroboratory of the witnesses examined at the trial, or cumulative on the issues joined in the case and heard, and as such, under well settled principles, does not warrant a reopening of the case. Second, the newly discovered evidence relates to the fraud and misrepresentation alleged in the original cross-bill to have been practiced by the appellees to bring about the purchase of the mines by appellants. It will be observed in the opinion rendered on the appeal, handed down simultaneously with this that a decision of the case is reached notwithstanding the perpetration of the fraud complained of. The newly discovered evidence is therefore immaterial.

The motion is denied.