## MANDELBAUM v. GOODYEAR TIRE & RUBBER CO. et al.

(Circuit Court of Appeals, Eighth Circuit. May 30, 1925.)

No. 6818.

**1. Fraud ⬤⟳50—Purchaser of stock must prove assets were of less value than represented in prospectus for sale of stock.**

That value of certain assets of a company were of less value than represented in its prospectus for sale of stock must be proved by stock buyer, suing for fraud, though they had previously been carried at lower figure on company's books.

**2. Fraud ⬤⟳13(1)—Representation as to securities owned by company selling its stock held not false.**

Representations by company, in prospectus for sale of its stock, as to "securities owned," *held* in view of a stock dividend which had been issued to it out of earnings of a subsidiary company, not false, within definition attaching to actionable fraudulent representations.

**3. Fraud ⬤➞16—Failure of prospectus for sale of stock to disclose building of club house for employees not fraudulent concealment.**

Failure of company in prospectus for sale of stock to disclose that it had built a club house for its employees *held* not a concealment of its condition amounting to fraud.

**4. Fraud ⬤➞16—Failure of prospectus for sale of stock to show account with president held not fraudulent concealment.**

That company, in prospectus for sale of its stock, failed to show an account with its president, carried under head of "sundry debtors," was not a fraudulent concealment, on the theory that loans to officers are improper, and, if made, should be disclosed on face of prospectus; it being shown that the account chiefly represented properties of the company taken and held in the officer's name for business convenience.

**5. Fraud ⬤➞16 — Failure to list commitments for raw materials in prospectus held not fraudulent concealment.**

Failure of company to list, in prospectus for sale of its stock, contracts, known as "commitments," for future delivery of raw material, required in vast quantities in its manufacturing business, and much of it obtainable only abroad, cannot be regarded as a fraudulent concealment knowingly or recklessly made with intent to deceive; such contracts being then regarded by the company as of great value, though proving a liability because of unforeseen subsequent business depression.

**6. Fraud ⬤➞12—As applied to future, any representation as to assets maintained is without effect.**

Relative to claim of fraudulent representations in prospectus of company for sale of its stock, any representation as to amount of assets maintained for benefit of preferred stock, as applied to the future, is of no effect.

**7. Appeal and error ⬤➞768—In view of statement in brief, court not required to take judicial notice.**

Appellate court is not faced with necessity of taking judicial notice of financial depression at a certain time, in view of statement in appellant's brief, "We have no quarrel with the assertion that * * * this appellate court may take judicial notice that a financial depression commenced" at such time.

**8. Evidence ⬤➞67(3)—Accountants' reports on subsequent condition held inadmissible on condition at time of claimed fraudulent representations.**

Reports of expert accountants as to the then financial condition of a company furnish no safe guide as to its condition six months before, when it is claimed to have made fraudulent representations in sale of its stock; the accountants having been employed by bankers, who undertook to refinance and reorganize the company, so that they would naturally make very conservative estimates, and a great financial depression having occurred in the meantime.

**9. Evidence ⬤➞18—Effect on stock prices of financial depression matter of common knowledge.**

It is matter of common knowledge that a period of great financial depression, coupled with necessity of refinancing and reorganization, would of itself depress market price of stock, without regard to its actual intrinsic value.

**10. Evidence ⬤➞601(4)—Stock quotations not conclusive of actual value.**

Stock quotations are in themselves not conclusive as to actual value of company's stock, being governed in great part by demand, whether bidding is active or otherwise.

**11. Fraud ⬤➞50 — Plaintiff must prove how much less than paid property was worth.**

Plaintiff, in an action for damages for fraud in sale, as distinguished from one for rescission, must prove that property at time of sale was worth less than paid, and how much less.

**12. Evidence ⬤➞113(4)—Price on resale of stock held no evidence of value when purchased, 27 months before.**

Price at which plaintiff sold stock is no evidence of its value when he bought it, 27 months before, at which time he claims to have been defrauded by false representations as to company's financial condition.

In Error to the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Action by Sidney Mandelbaum against the Goodyear Tire & Rubber Company and others. Judgment for defendants, and plaintiff brings error. Affirmed.

The Goodyear Tire & Rubber Company is an Ohio corporation, organized in 1898, with its principal place of business at Akron, Ohio. Its business is manufacturing and selling rubber goods, more particularly automobile tires. Its original authorized capital was $100,000. It started in its business in a comparatively small way, but grew rapidly and continuously. In 23 years, ending with 1920, it had grown from an enterprise employing 175 people, with a business of $1,-000,000 a year, to one employing 50,000 people, with a business of $200,000,000 per year. Its capital had been increased from time to time to keep pace with its business development, until at the beginning of 1920 its authorized capital stock was $200,000,000, divided equally between common and preferred stock. All of this authorized capital had not been issued and sold, and in April, 1920, the company arranged to offer to the public $10,-000,000 of its common stock and $20,000,000 of its preferred stock; the same being offered in blocks of two shares of preferred and one share of common stock at the par value of

$300. The defendant Counselman & Co., was employed as broker. The offering was made through a prospectus containing, among other things, a condensed balance sheet taken from the books, and setting forth the financial condition of the company as of April 30, 1920, and signed by F. A. Seiberling, its president.

Plaintiff in error, Mandelbaum, was an officer of a department store conducting a mercantile business in Des Moines, Iowa. He was also a partner in a garage business in Des Moines, Iowa, and further interested in a dry goods store conducted under the name of J. Mandelbaum & Sons. About the middle of July, 1920, plaintiff in error was visited at his place of business by employees of the Goodyear Company who brought with them the prospectus in question and solicited Mandelbaum's subscription to the stock. This prospectus was left for a few days with plaintiff in error, at the end of which time he subscribed for 200 shares of preferred stock and 100 shares of the common stock, for which he paid ultimately $30,000. In October, 1920, the Goodyear Company found itself in financial difficulties to such extent that it was unable to meet its obligations as they fell due. Application was made to a syndicate of bankers for relief. By these bankers Price, Waterhouse & Co., expert accountants, were employed to audit and ascertain the dependable financial condition of the company, which would justify loans essential to tide the company over its present difficulties. $21,000,000 were loaned in October 1920, and subsequently, beginning in December, 1920, and ending in May, 1921, a refinancing program was effected, whereby the company was maintained as a going concern and the supervision of the banks supplying the funds was to be continued for a period of years. It is unnecessary to enter more explicitly into the details of this arrangement.

Naturally, under these circumstances, the stock of the Goodyear Company suffered a severe decline in the stock market. Plaintiff in error held his stock until October 25, 1922, when he sold his common stock for $9.50 per share and his preferred stock for $27 per share, aggregating $6,350. He alleges this to be the value of the stock when delivered to him, and brings suit for the difference between that sum and the amount paid upon his subscription in the sum of $23,650, for which, with interest from July 15, 1920, he prays judgment. Counselman & Co., as brokers for Goodyear in the sale of said stock, and the Ætna Casualty & Surety Company, bondsman for Counselman & Co., are made codefendants.

Plaintiff in error predicates his right to recover upon the ground that he was induced to purchase these stocks upon false and fraudulent representations and concealments through the prospectus furnished him, to which reference has been made. The alleged misrepresentations counted upon in the petition and the amendments thereto are numerous. In argument and in the briefs, under the heading "Charges of Fraud," they are thus summarized by counsel for plaintiff in error:

"First. That in making up the prospectus of assets, real estate, buildings, machinery, and equipment was stated to be $47,898,160.-38. The bulk of the plants and equipment were constructed before the previous high prices (meaning the high prices in 1920), and that such values were taken at actual cost of the property, less a large depreciation, when in fact, on April 30, 1920, real estate and buildings were appreciated $5,-000,000.

"Second. That the prospectus carried an item of 'Securities Owned' of $11,217,913.75 (meaning investments in subsidiary companies), and that such investments were carried on the books at cost, or the actual amount invested therein. That among the items making up the above $11,217,931.75 was the investment in the Goodyear Tire & Rubber Company in Canada, which was actually $682,980.48, and was appreciated for the purpose of this statement by adding to it $3,379,000, called a 'stock dividend.'

"Third. That the prospectus failed to disclose the company had built a club house for the use of its employees for $1,500,000.

"Fourth. That the prospectus failed to disclose that the president of the company, F. A. Seiberling, was indebted to the company for more than $3,500,000, and other large sums had been loaned to other officers of the company. This item was concealed by carrying it under the head of 'Sundry Debtors.'

"Fifth. That the plaintiff subscribed for 200 shares of preferred and 100 shares of common original capital stock, and that the defendants went on the market and bought stock and delivered it to him, instead of the original capital stock.

"Sixth. When the prospectus was made up, showing the financial statement as of April 30, 1920, the company had a surplus of $43,000,000 over and above all its liabilities, including capital stock. That after declaring a common stock dividend of 150

per cent., totaling more than $31,000,000, it had a surplus belonging to common stockholders of $12,000,000 plus. That when the stock was sold to the plaintiff the company failed to disclose, either by its officers, agents, or in the prospectus, that it had outstanding, not included as liabilities in its financial statement, large amounts of contracts for raw materials, known as 'commitments,' on which the price was then declining, and which resulted in losses to the company of $19,000,000.

"Seventh. That the statement in the prospectus that 'the net earnings of the company applicable to the payment of dividends on outstanding preferred stock had exceeded 54 per. cent. per annum 10 years preceding' was false.

"Eighth. The statement in the prospectus that 'the company then had and maintained. for the benefit of preferred stockholders "net current assets" in amount not less than 110 per cent. and "total net assets" in amount not less than 200 per cent. of the total amount of preferred stock outstanding' was false.

"Ninth. That the company failed to disclose, either by its officers, agents, and prospectus, that the corporation was then in a failing financial condition, and would, even though it raised $30,000,000 from the sales of stock then being offered, be required to borrow a large sum of money in October, 1920, or refinance and reorganize the company, which in fact wiped out and destroyed the real value of the stock then being offered to the plaintiff and others."

At the close of plaintiff's case the court directed a verdict in favor of the defendants. In his assignments of error plaintiff in error makes a large number of specifications, all of which in the last analysis may be reduced to two heads: First, the action of the court in excluding testimony which plaintiff in error conceived would establish the falsity of the representations made and the measure of his recovery; second, his right to go to the jury upon the evidence received and tendered. The foregoing statement will serve to disclose the general situation presented, although essential facts can best be stated incidentally in the opinion.

Howard L. Bump and John. N. Hughes, both of Des Moines, Iowa, for plaintiff in error.

Vincent Starzinger and F. W. Lehmann, Jr., both of Des Moines, Iowa, for defendants in error.

Before LEWIS, Circuit Judge, and VAN VALKENBURGH and FARIS, District Judges.

VAN VALKENBURGH, District Judge (after stating the facts as above). It should be kept in mind at the outset that this case involves no sporadic case of stock-jobbing by a concern conceived and organized for that specific purpose without substantial business foundation. The Goodyear Tire & Rubber Company is one of perhaps four large corporations of similar character which have been developed in connection with the phenomenal growth of the automobile industry. At the time of the transaction here involved it had been in business for 22 years, and was known throughout the United States and abroad as a business concern of great magnitude. It had then and still has assets running high into the millions. Its sales were and are tremendous in volume. Its business activities are complex and far-reaching, territorially and otherwise, and its standing in the business world has been such as to enlist credit from conservative financial sources far beyond the ordinary range. All these conceded facts must be accorded their proper weight in determining whether in the present instance this defendant has departed from a course of fair dealing and has committed the fraud charged in the complaint.

Now, as to the misrepresentations alleged, if the plaintiff in error fails to sustain its allegations in this respect, his case must fail, even though his investment turned out to be an unfortunate one. This court has held, following the established rule, that: "Representations, to constitute sufficient basis for an action of deceit, must be fact statements, must be untrue, and known to be untrue, or else recklessly made, must be made with intent to deceive, and for the purpose of inducing the other party to act, and the other party must rely thereon, and be induced thereby to act to his injury." Pain v. Kiel et al. (C. C. A.) 288 F. 527, 529.

[1] It is first charged that, in making up the prospectus of assets, real estate, buildings, machinery, and equipment, the real estate and buildings were appreciated $5,000,000, making the total $47,898,160.38. It appears that prior to April 30, 1920, these items were carried on the books of the company at $42,898,160.38. Plaintiff in error claims that this increase by $5,000,000 was fraudulent. The only evidence upon the subject comes from officers and others connected with the defendant company. They state that these items were always carried at a

very low figure, and that the highest allowable percentage of depreciation was applied; further, that many items of reconstruction were treated as repairs and carried under operating expenses; that other items, which were tangible and proper to be included, had been ignored in bookkeeping. It appears, without attempt at concealment, that this property had been carried at the lowest permissible figure to accomplish a saving in taxes. Whatever may be the fact about this, it was incumbent upon plaintiff in error to establish by the proofs that the property in question was of a value less than that represented. All the testimony in the case is to the contrary. Any doubt which might arise from the bookkeeping addition made is dissipated by the report of the accountants for the bankers, upon which plaintiff in error seeks to rely, bearing date October 31, 1920. The value there shown corresponds almost exactly with the value stated in the prospectus, and at that date it is conceded that the affairs of defendant in error were at their lowest ebb.

[2] It is next charged that, under the heading "Securities Owned," the investment in the Goodyear Tire & Rubber Company in Canada was carried at $4,061,980.48, when the actual cash investment therein was but $682,980.48. It was shown in testimony, without contradiction, that the amount added to the cash investment was a stock dividend which had been issued to the parent company, defendant in error, out of earnings of the Canada subsidiary. There was no showing that this subsidiary had not made the earning from which this dividend was declared. In the absence of such dividend the parent company might have drawn down this sum in cash. It left the money with the subsidiary, taking stock in lieu thereof. Under such circumstances it cannot be said that its representation in this particular was false, within the definition attaching to actionable fraudulent representations.

[3] It is next urged that the prospectus failed to disclose that the company had built a club house for the use of its employees at a cost of $1,500,000. The weight of the testimony is that this club house was built prior to 1920. It was built for the purpose of providing greater facilities for the company's employees. It was regarded by it as a good investment. We do not think that the failure to discuss this item in its prospectus could be regarded as a concealment of the company's condition amounting to fraud. As well might it be contended that it was the duty of the Goodyear Company to disclose in its prospectus its entire previous course of business, in order that it might be judged whether its management had been judicious and free from criticism.

[4] The fourth specification is that the prospectus failed to disclose that the president of the company, F. A. Seiberling, was indebted to the company for more than $3,500,000, and that other large sums had been loaned to other officers of the company. This item was carried under the head of "Sundry Debtors." But little is contained in the record with respect to loans to other officers of the company; the principal emphasis being laid upon the Seiberling item. At the outset it may be stated that no evidence was introduced, nor substantial claim made, that these officers were not fully able to meet their obligations to the company; the inferential claim being that loans to officers are improper per se, and, if made, should have been disclosed on the face of the prospectus. We find in this contention no support for the charge of fraudulent concealment. Mr. Seiberling was placed upon the stand as a witness for plaintiff in error. He was the president and one of the founders of the corporation. He explained that he had a running account with the company, which consisted largely of company property taken and held in his name for business convenience; this included real estate, patents, and, perhaps, other items; that sometimes the balance would be in his favor, and sometimes in favor of the company; that the charge against him upon the books of the company did not at any time represent his personal obligation, except in part. This statement is corroborated in parts of the evidence tendered by plaintiff in error. From such, it appears that the account of Seiberling was closed by the company taking over the Goodyear Athletic Field, containing 30 acres, and one-half ownership of the Akron, Canton & Youngstown Railway Company, represented by $7,500,000 par value of the stock, which properties were stated to have been acquired for the benefit of the Goodyear Company and were essential to the proper conduct of its business. Thus considered, the transaction presents no element of fraud as disclosed by this record.

The fifth specification is that plaintiff in error subscribed for original stock, and that the defendants went upon the market and bought stock and delivered it to him, instead of the original capital stock. This charge finds no support in the record.

[5] The next charge is that it was represented in the prospectus that, after declaring

a common stock dividend of 150 per cent., the company had a surplus belonging to common stockholders of more than $12,000,000; that when the stock was sold to plaintiff the company failed to disclose that it had outstanding, not included as liabilities in its financial statements, large amounts of contracts for raw materials, known as "commitments," on which the price was then declining, and which resulted in losses to the company of $19,000,000. We have already seen that the annual sales of the Goodyear Company at the time this prospectus was issued had reached the tremendous total of $200,000,000. A vast amount of material, rubber and fabric, had to be available for the prompt manufacture of the product involved in these sales. Much of this could be procured only in foreign countries. Much time was necessarily consumed in transportation, and the manufacturer was obliged to provide against the uncertainties of market supply and the alertness of its competitors. In other words, if this large business, with its great overhead expense, were to operate successfully and economically, its raw material must be at hand when required. It, therefore, as had been its practice, had contracted in advance for large quantities of rubber and fabric at a price then far below the market; in fact, its commitments continued to be at prices below the market until the autumn of 1920.

At the time the prospectus was issued, and at the time this stock was sold, it convincingly appears that these contracts were regarded by it as of great value. They were carried neither as an asset nor a liability. No complaint is made that they were not carried as an asset. At that time the contingency that they might become an obligation was not anticipated. The business depression which followed was not foreseen in view of business conditions at that time. However, this is largely a matter of bookkeeping. No witness testified that it is proper practice to carry such an item as an obligation upon a balance sheet. One witness states that in issuing such a prospectus he would have called attention to this arrangement in a footnote merely. All things considered, the failure in the prospectus to list these commitments for raw material, then undoubtedly regarded as a wise and profitable business provision, cannot be regarded as a fraudulent concealment knowingly or recklessly made with intent to deceive. Later, it is true, owing to the business depression in the fall of 1920, to which reference will be hereafter made, the company experienced a great loss, which more than wiped out its surplus; but this happening cannot alter the principle involved.

The seventh specification is that the statement that the net earnings of the company applicable to the payment of dividends on outstanding preferred stock had exceeded 54 per cent. per annum for the 10 years preceding was false. This charge is not supported in the testimony. It is shown in evidence offered by plaintiff in error that dividends of at least 48 per cent. were paid. From this showing several concededly prosperous years were omitted, in which dividends may have been paid. In any event, plaintiff in error failed to establish the falsity of the representation, and that it was tainted with fraud.

[6] It is next urged that the statement in the prospectus that the company then had and did maintain for the benefit of preferred stockholders net current assets in amount not less than 110 per cent. and total net assets to an amount not less than 200 per cent. of the total amount of preferred stock outstanding was false. Reference to the prospectus discloses that the statement upon which this charge is based is contained by way of recital under the heading "Description of Preferred Stock," in which the restrictions and covenants by which that stock was assumed to be protected were detailed. Therein this clause appears: "The company shall maintain at all times net tangible assets of not less than 200 per cent. and net current assets of not less than 110 per cent. of the par value of the preferred stock outstanding." Therein is contained no express statement as to net assets then on hand. The balance sheet, contained in the prospectus and taken from the books of the company, showed, of course, that it had such assets. As applied to the future, the representation would be without effect in any event. As to the condition existing at the time the stock was sold, no evidence was produced which would indicate that the company and its officers did not believe that the condition of the company justified the representation made.

Finally, it is contended that the company failed to disclose that the corporation was then in a failing financial condition and would be required to borrow a large sum of money in October, 1920, to refinance and reorganize the company, thereby wiping out and destroying the real value of the stock then to be offered to the plaintiff and others. This is a general charge that, at the time the prospectus and balance sheet were put forth and this stock sold, the Goodyear Company,

through its officers, knew that it was in a failing condition, or at least that its stock was practically worthless; that by October, 1920, it would be compelled to borrow money in large amounts and pass through the process of reorganization, which later took place. The record fails to justify this charge, and we are impelled to the conclusion that, however unfortunate the business experience of the defendant company may have been later in the year, at the time the alleged representations were made, and the stock of plaintiff in error was acquired, the defendant company is not shown to have anticipated the great change which took place in the business affairs of the country.

[7] It is a matter of common knowledge that, beginning in the late summer and extending into the fall of 1920, the business of the country generally passed through a period of deflation and depression that brought loss, and even ruin, to business enterprises of supposed soundness and strength. This was particularly true of those industries depending largely upon great volume of sales and requiring large lines of credit to enable them to carry this volume of business. Sales fell off to an appalling extent; values declined accordingly; decreased demand for finished products produced decreased demand for raw materials, and the price of such decreased proportionately; but obligations remained fixed, and a company organized as was the Goodyear Company obviously could not reduce its overhead rapidly enough to keep pace with changed conditions. It is to this state of affairs, which came on in an astonishingly short period, that the defendant company ascribes the misfortune which overtook it, and the record, as well as common knowledge, supports this view.

It is urged by counsel for defendants in error that this court can take judicial notice of these matters, and from the language of the Supreme Court in Lincoln Gas Co. v. Lincoln, 250 U. S. 256–268, 39 S. Ct. 454, 63 L. Ed. 968, this would seem to be so. However, we are not faced with this necessity, because counsel for plaintiff in error in their briefs say: "We have no quarrel with the assertion that the court, both trial court and this appellate court, may take notice that a financial depression commenced in the late fall of 1920 and lasted for some considerable time." Furthermore, officers of the Goodyear Company introduced by plaintiff in error stated that, based upon past experience, they had made a budget of sales for 1920 aggregating $250,000,000. It is conceded that the budget contemplated at least $220,000,000. The actual sales were $204,000,000. This alone would account for a large part of the deficit in anticipated revenues of the company. There are many items, to which reference need not here be made, which further depleted the treasury.

[8] The principal error assigned is that the court excluded evidence upon which plaintiff in error relied to show the falsity, not only of the specific representations made, but that the financial condition of the company generally in April, 1920, was not as represented. This evidence may be reduced practically to the reports made by Price, Waterhouse & Co., expert accountants, October 31, 1920, and later in 1921. The court excluded these statements as furnishing no proper index of the condition of the company six months before that time for several reasons. In the first place, these accountants were employed by the bankers who undertook to refinance and reorganize the Goodyear Company. Their object was to make a statement which would justify the safe investment of many millions of dollars by their employers. In so doing they made, naturally, a very conservative estimate of assets. In other words, to use a common expression, they cut them to the bone. They discounted all accounts and bills receivable that were not certain of ready collection and payment. Large losses did occur through the falling off of business and the decline in the price of raw materials. All these things explain in large measure, if not entirely, the difference in values appearing between the Goodyear statements of April, 1920, and the statements of the accountants made in the late fall of 1920 and the spring of 1921.

Furthermore, the court held that, in view of the great financial depression conceded to have taken place in the fall of 1920 and thereafter, a statement of the condition of the company at that time, conditions being materially changed, could furnish no safe guide from which the jury could determine the condition of the company in the spring and early summer of the same year. We think the court was right in so holding.

[9-11] The court further refused to admit quotations of the Goodyear stock for a period extending from December 11, 1920, to October 31, 1921, as furnishing no index of the value of that stock at the time plaintiff in error purchased. This ruling was correct for several reasons. It is a matter of common knowledge that a period of depression, such as has been shown to exist, coupled with the necessity of refinancing and reorganizing, would of itself depress the price of any

stock upon the market without regard to its actual intrinsic value. Furthermore, stock quotations are in themselves not conclusive as to the actual value of the stock of a company. Such quotations are governed in great part by the demand—whether bidding is active or otherwise. This action differs from one for rescission in a very important particular. In the latter case, if fraudulent representations are shown, a plaintiff may recover, even though what he receives be equal in value to that with which he parts; but, in an action on the case for damages, the rule is otherwise. It is then incumbent upon him to prove that the property at the time of the sale was worth less than the price paid, and how much less. Sigafus v. Porter, 179 U. S. 116, 21 S. Ct. 34, 45 L. Ed. 113; Nupen v. Pearce, 235 F. 497, 149 C. C. A. 43; Richardson v. Lowe et al., 149 F. 625, 79 C. C. A. 317.

[12] Plaintiff in error bought his stock in July, 1920, and sold it October 25, 1922. The amount he received furnishes no index of the value of the stock at the time he bought it. We conclude, then, that the charge of fraudulent representations knowingly and recklessly made as an inducement to plaintiff in error to purchase his stock is not sustained; that the evidence excluded by the court was properly excluded; that, even though that evidence had been admitted, plaintiff in error has failed to show the difference in value between that he parted with and that which he received. Plaintiff in error has evidently proceeded upon the assumption that because, after the intervention of a great industrial depression, the financial condition of the Goodyear Company within a period of six months was substantially reduced, that condition could not have been as represented at the beginning of that period. If the case had been submitted, the jury would have been furnished with no recognized basis upon which to found its verdict. It would have been compelled to resort to speculation and to find for the plaintiff, if at all, upon the ground that he had suffered a loss in his investment. The court realizes the difficulties in proof which confronted the plaintiff in this case. It is only one of the many cases in which the plaintiff fails in his testimony, but this cannot justify any departure from settled rules of proof resting upon all plaintiffs. Patton v. Texas & Pacific Railway, 179 U. S. 658, loc. cit. 663, 21 S. Ct. 275, 45 L. Ed. 361.

The judgment below is accordingly affirmed.