# Richmond.

## ARAGON COFFEE COMPANY v. ROGERS.

### March 1, 1906.

#### Absent, Cardwell and Harrison, JJ.

1. NEGOTIABLE INSTRUMENTS—*Fraud in Procurement—Innocent Holder—Repurchase by Payee.*—As a general rule the holder for value and without notice of a negotiable note acquired before maturity can transmit a complete title to a third person, even though the latter has knowledge of facts which would have defeated a recovery upon the note in the hands of the payee; but this rule is subject to the exception that if a payee sell negotiable paper to an innocent third party, and repurchases it, he does not thereby acquire any better title against the maker than he possessed in the first instance.

2. EVIDENCE—*Fraud—Refusal of Party to Testify—Presumption—Colorable Holder of Negotiable Note as Plaintiff—Real Plaintiff—Question for Jury—Case at Bar.*—Where, in an action on a negotiable note, the defendant sets up by his plea that the note was procured by the fraud of the payee, and that the title of the plaintiff is colorable merely, and that the payee is still the real owner, the failure and refusal of the plaintiff, while being examined as a witness in the case, to answer questions which will throw light on the issue, without any satisfactory explanation or reason for such refusal, raises a presumption against the *bona fides* of the transaction by which he became the holder of said note, and it is for the jury to say whether or not the plaintiff is a holder in good faith, or connived with the payee to purchase the note as their agent. In the case at bar a jury would have been warranted, under the circumstances, in finding that the transfer to the plaintiff was colorable only, and that the payee was the real owner of the note in suit, and hence the court will so determine on a demurrer to the evidence by the plaintiff.

Error to a judgment of the Circuit Court of the city of Richmond, in an action of debt. Judgment for the plaintiff. The defendant assigns error.

*Reversed.*

The opinion states the case.

*H. W. Goodwyn* and *Samuel A. Anderson,* for the plaintiff in error.

*Leake & Carter,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

J. W. Harrison, doing business under the name and style of The Aragon Coffee Company, of Richmond city, purchased of Hills Brothers Company, a corporation in the city of New York, five hundred bags of coffee, for which he made a negotiable note for $3,727.02, dated January 11, 1904, payable four months after date to Hills Brothers Company, or order, at Planters National Bank, Richmond, Virginia. Before the maturity of this note it was indorsed to the National Park Bank of New York, who it is conceded acquired it in the ordinary course of business, and was an innocent holder of it for value and without notice. When the note fell due, payment was demanded and refused, and the note was duly protested. On November 14, 1904, this note was indorsed to Alfred M. Rogers, without recourse, who paid to the National Park Bank $3,841.69, the full amount represented by the note, principal and interest.

In March, 1905, Rogers sued the maker, the Aragon Coffee Company upon this note. The defendant pleaded *nil debet* and a plea of set-off, in which he avers that he purchased of Hills

Brothers Company a certain lot of coffee, which was represented to be sound and as good as the sample of coffee then and there exhibited to the defendant by Hills Brothers Company, and that he afterwards purchased five hundred sacks of the coffee, relying on the promise of Hills Brothers Company that it was pure and unadulterated, and as good as the sample shown and exhibited to the defendant company. The plea then alleges that the coffee was not sound and free from defects, but was unsound, and that both the sample and the coffee had been tampered with and adulterated, but so skilfully and cunningly that the defendant did not discover the fraud, and could not have discovered it without such a careful examination as no man would make unless he had reason to suspect the perpetration of a fraud; that the coffee delivered was so common and inferior, and gave forth such an offensive odor when roasted and made into a beverage that it could not be used, and that to have used it in his business would have damaged his trade and reputation. The plea further avers that Hills Brothers' Company is the real plaintiff in the suit, and that it has formed an unlawful combination with the National Park Bank of New York and Alfred M. Rogers, the object of which was wrongfully and unlawfully and by deceit to cut defendant off and prevent him from showing his rightful and lawful set-offs and equities against said note. In conclusion he claims to have been damaged by the fraud practiced upon him in the sum of $1,987.10, which sum he seeks to have set off against the note, and the balance of $1,740.92 was brought into court, which the defendant stated he was ready to pay to the plaintiff.

Upon this plea issue was taken, and, evidence on the part of the plaintiff and the defendant on this plea having been introduced before the jury, the plaintiff demurred to the defendant's evidence. The jury found a verdict subject to the demurrer to

the evidence, and the court gave judgment in favor of the plaintiff, to be credited by the amount which the defendant had paid into court.

We observe *in limine,* that there is no occasion to discuss the transaction as between the Aragon Coffee Company and Hills Brothers Company. The evidence is conclusive to show a bald and iniquitous fraud. The only question which we need to consider is, whether or not the parties before the court occupy such a relation to the transaction as that, under the law merchant, we must shut our eyes to the truth and close the door upon all investigation.

The National Park Bank, being the holder for value and without notice, could transmit a complete title to a third person, even though that third person had knowledge of the facts which would have defeated a recovery upon the note in the hands of the payee; the general rule being that if a person taking with notice purchase from one without notice, he is entitled to stand in the latter's shoes and take shelter under his good faith. If it were not so, the *bona fide* purchaser without notice might be unable to dispose of the property, and thus its value in his hands be materially deteriorated. A *bona fide* holder, it is said, is entitled to have the whole world for his market.

But there is an exception to this rule, which is well established: If the payee sell negotiable paper to an innocent third party and repurchases it, he does not thereby acquire any better right against the maker than he possessed in the first instance. *Andrews* v. *Robertson,* 87 N. W. 190, 54 L. R. A. 673, 87 Am. St. 870; *Church* v. *Ruland,* 64 Pa. 432; *Ely* v. *Wilcox,* 26 Wis. 91; *Elwell* v. *Tatum,* 6 Tex. Civ. App. 397, 24 S. W. 71, 25 S. W. 434; *Hoye* v. *Kalashian* (R. I.), 46 Atl. 271; *Tod* v. *Wick Bros.,* 36 Ohio St. 370.

Judge Cooley, in *Kost* v. *Bender,* 25 Mich. 515, says: "As a general rule, the *bona fide* holder of negotiable paper has a right to sell the same, with all the rights and equities attaching to it in his own hands, to whoever may see fit to buy of him, whether such purchaser was aware of the original infirmity or not. Without this right he would not have the full protection which the law merchant designs to afford him, and negotiable paper would cease to be a safe and reliable medium for the exchanges of commerce. For, if one can stop the negotiability of paper against which there is no defense, held by another, it is obvious that an important element in its value is at once taken away. But this rule has never been applied to a purchase by the original payee, and it is not essential to the protection of the innocent endorsee that it should be. It cannot be very important to him that there is one person incapable of succeeding to his equities, and who consequently would not be likely to become a purchaser. If he may sell to all the rest of the community, the market value of his security is not likely to be affected by the circumstance that a single individual cannot compete for its purchase—especially when it is considered that the nature of negotiable securities is such that their market value is very little influenced by competition. Nor is there any rule or principle of law that would be violated by permitting the maker to set up his defense against the payee, when he becomes the indorsee, with the same effect as he might have done before it had been sold at all; nor is there any valid reason against it."

In this case, then, it was not sufficient for the defendant to show that there was fraud in the transaction between him and Hills Brothers Company, for notwithstanding that fraud the National Park Bank, being a *bona fide* holder of the note, could transmit, and Rogers, the plaintiff, could acquire a title to the note, free from all antecedent equities—unless there was evi-

dence tending to prove that Rogers purchased, not for himself, but for the original payee in the note, Hills Brothers Company, and that this company and not Rogers was the actual beneficial plaintiff. We will, therefore, consider the evidence in the light of these principles.

The only evidence adduced by the plaintiff was the note upon which he sued. Having read that to the jury, he rested.

The history of that note is given in the record. The National Park Bank acquired it, as we have already said, in due course of business, and is, under the law merchant, to be considered an innocent holder for value and without notice.

On May 16, 1904, the attorney for the National Park Bank wrote to the Aragon Coffee Company the following letter:

*"Gentlemen*:

"My client, the National Park Bank, holds your note for the sum of $3,727.02 to the order of the Hills Brothers Co. which matured on the 11th inst. and has been returned from the bank where it was payable protested. The note has been placed in my hands with instructions to take such steps as may be necessary to collect it, and I have to request that you will send me without delay your check for the amount of the note, with interest to date, and $1.00 protest fees.

"Yours truly,

To this letter the Aragon Coffee Company replied, through its attorney:

RICHMOND, VA., May 24, 1904.

. . . . . "Your letter of May 16th to the Aragon Coffee Co. has been referred to me, and in reply I beg to state that this note represents the purchase price of coffee bought by

the Aragon Coffee Co. from Hills Bros. & Co. The said coffee was not according to sample, and that the attention of Hills Bros. was called to this in several letters to them from the Aragon Coffee Co. some time past, but which they refused to consider. My clients are perfectly square people in every particular, but do not propose to pay for coffee that they cannot use. I would suggest that you will probably find your way easier to make this money out of Hills Bros. & Co. than out of the Aragon Coffee Co.

"Very truly yours,

"H. W. GOODWYN."

It is among the agreed facts in the case that Hills Brothers Company had to their credit with the National Park Bank during all the period covered by this investigation at least the sum of five thousand dollars. It appears that one of the principal stockholders in Hills Brothers Company was the father-in-law of the plaintiff, Rogers; that his brother-in-law was the president of the company; and that his wife was one of the stockholders in the company. It further appears that the first information Rogers had with respect to this note was derived from his father-in-law; that at his suggestion the plaintiff went to the attorney for the National Park Bank, in whose custody the note was; that he purchased it, paying the full principal and interest due upon the note; that in order to make the purchase he had to raise the money by the sale of stocks; that he took the note from the bank without recourse, after it had been protested, and with the knowledge that its collection would involve a law suit. He was put upon the stand as a witness by the plaintiff in error, and every effort to elicit the truth with respect to this transaction was met with evasion, equivocation, or silence. He was asked if to answer the questions would tend to in-

criminate him; he replied that it would not. The question again would be put to him, and he would again decline to answer. Why he should have desired to make this investment, when in order to make it he found it necessary to change his investment and dispose of stocks, it is impossible to answer with even a reasonable conjecture. He paid full value for a protested note. He took it without recourse. He knew that it involved a law suit, and yet, when called upon to explain, every question was met with a refusal to answer.

In Wigmore on Evidence, volume 1, section 285, it is said: "The consciousness indicated by conduct may be not an indefinite one affecting the weakness of the cause at large, but a specific one concerning the defects of a particular element in the cause. The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, that the party fears to do so, and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party. These inferences, to be sure, cannot fairly be made except upon certain conditions, and they are also open always to explanation by circumstances which make some other hypothesis a more natural one than the party's fear of exposure. But the propriety of such an inference in general is not doubted. The non-production of evidence that would naturally have been produced by an honest and, therefore, fearless claimant permits the inference that its tenor is unfavorable to the party's cause."

And continuing this subject, the same author at section 289 says: "At common law the party-opponent in a civil case was ordinarily privileged from taking the stand; but he was also disqualified; and hence the question could rarely arise whether

his failure to testify could justify any inference against him. But since general abolition both of the privilege and the disqualification, the party has become both competent and compellable like other witnesses; and the question plainly arises whether his conduct is to be judged by the same standards of inference. This question should naturally be answered in the affirmative."

It seems plain to us that there is a stronger presumption to be raised against a party in whose possession the facts must be, if they exist, by which suspicion would be removed and all question as to the propriety of his conduct be set at rest, who stolidly refuses, without the suggestion of a reason, to aid the court in arriving at the truth. It is within the bounds of possibility that a reason existed, why "as a matter of business," to use his own language, the plaintiff may have thought it desirable to buy a protested note which he knew could only be collected as the result of a law suit. If such explanatory facts existed, they were in his breast, and his refusal to disclose them warrants the hypothesis that he feared the exposure.

As was said in *Union Bank* v. *Stone,* 50 Me. 595, 79 Am. Dec. 631, "There was evidence proving or tending to prove that a notice of demand and non-payment had been given the defendant. He had been notified to produce it, and did not. He was present and not a witness. If he had never received such a notice, he knew it, and knowing it, would be little likely to omit an opportunity of stating a fact thus conclusively in his favor. The evidence tended strongly to charge him. A word from his lips might exonerate him from all liability. . . . . If notice had been received, and the defendant knew it, he might well be silent. The utterances of the truth would establish the plaintiff's claim. . . . If he were a witness, he must either state the truth or a falsehood. If he testified truly,

his hope of a successful defense was at an end. The defendant does not offer his own testimony. He prefers the adverse inferences which he cannot but perceive may be drawn therefrom, to any statements he could truly give, or to any explanations he might make. He prefers any inferences to giving his testimony. Why? Because no inferences can be more adverse than would be the testimony he would be obliged by the truth to give. The fact of not testifying was obvious to the jury. . . . No court could perceive such a fact without attaching some degree of importance, more or less, to its existence, according to the necessity of the testimony and the emergencies of the defense. No judge exists who would not, if the trial had been before him, regard this as a fact bearing on his decision."

And in *Brown* v. *Schock,* 77 Pa. 471, it is said: "A man of ordinary intelligence must know that his failing to appear, when he had a strong motive to appear, would be evidence against him; if he relies upon his ability to disprove the motive imputed, he takes the risk, but he leaves the effect of his conduct, as a matter of evidence for the opposite side, to go to the jury."

In *Bastrop State Bank* v. *Levy,* 106 La. 586, 31 South. 164, the court said: "Judicial tribunals are established to administer justice between litigants, and the first and most important step to that end is the ascertainment of the truth of the controversies which come before them. It is only when the truth is ascertained that the law can be properly applied in the just settlement of disputes. Litigants owe the duty of assisting in every legitimate way in the elucidation of the truth. When a defendant can by his own testimony throw light upon matters at issue, necessary to his defense and peculiarly within his own knowledge if the facts exist, and fails to go upon the witness stand, the presumption is raised, and will be given effect to, that the facts do not exist."

These cases are cited, not because of any similitude of their facts to the case before us, but because all of them illustrate and enforce the principle, that when a party can, by his own testimony, throw light upon the matter in issue and fails to go upon the witness stand, the presumption is raised, and will be given effect to, that the facts do not exist.

In the case of *Battersbee* v. *Calkins* (Sup. Ct. of Mich.), 87 N. W. 760, a firm of Niagara Falls, New York, were payees and holders of the note in suit. It was a negotiable promissory note, payable to their order. It was sold before maturity to a savings bank in Detroit, under circumstances which admittedly made the bank a *bona fide* purchaser. It was sold to this bank by the attorney of the payees, to whom it had been sent for collection. It did not appear whether or not the payees directed such sale. The attorney indorsed the note before sale in blank, as the payees had previously done. The note went to protest for non-payment, and subsequently it was indorsed to "any bank or order" over the signature of the savings bank, and transferred to a State bank, which sent to the savings bank its check for the amount due upon the note. Plaintiff was the cashier of the State bank, and testified that he was not the owner of the note, and had brought this action for the benefit of the bank. The defendant, who was the maker of the note, sought to show that the note was obtained by fraudulent representations made by an agent of the payees. The attorney for the payees before mentioned, called as a witness for the defendant, testified that he received the note before maturity for collection, and indorsed and sold it to the savings bank, and received payment of the consideration, which he put in the bank to his own credit, and checked out, as he did other money; that he sold the note because he wanted to, and did not know that he was directed to do so by the payees. It was shown that after protest of the note

this attorney had a conversation about the note with a stockholder and director of the State bank, who was also its attorney, who said that his bank would take it. The attorney of the payees before mentioned also wrote plaintiff, who was cashier of that bank, about the note, as did also the city bank after the attorney of the payee had told its officers that the State bank, of which plaintiff was cashier, would take the note. The court permitted the jury to find that the purchase of the note by the State bank, of which plaintiff was cashier, was collusive, as agent for the payees, holding that, if it was not a purchaser in the ordinary sense, it would not be entitled to set up the *bona fides* of the savings bank, and refused to direct a verdict for the plaintiff. In considering this question on a writ of error from a judgment in favor of the defendant, the Supreme Court said: "The plaintiff's counsel say that, being indorsed in blank, the possession of the note was sufficient proof of plaintiff's right to sue, and that it was error to permit the jury to defeat the plaintiff upon this ground, which they may have done under the charge. In the case of *Kost* v. *Bender,* 25 Mich. 515, it was held that the payee of a note could not avoid the equities in favor of the maker of it by repurchasing the note from a *bona fide* holder, to whom he had sold it. This rule should apply in this case, if, as claimed, the transfer to the Croswell bank (the bank of which the plaintiff was the cashier) was colorable only, to cover an actual payment or repurchase by Myers & Co. (the payees), or by their attorney on their behalf."

The case under consideration is, in our judgment, far stronger to show a collusive purchase upon the part of Rogers than the one cited. The facts which are set forth in this opinion, coupled with the conduct of the plaintiff when upon the stand as a witness, inexplicable upon any reasonable hypothesis except that he feared to disclose the truth and preferred to take the chance

of success by permitting the court and jury to grope for facts in the dark, when a word from him giving a rational account of his conduct would have dispelled all doubt, would have warranted the jury in believing that the National Park Bank, being possessed of funds belonging to Hills Brothers Company, which .company was ultimately liable to it for the note, concluded not to risk a law suit but to look to its immediate indorser, Hills Brothers Company, and so informed that company, which then hatched the scheme of a purchase of the note by Rogers, and thus hoped to consummate its fraud.

We think, upon the whole case, it was for the jury to say whether Rogers was a purchaser in good faith, or was conniving with Hills Brothers Company to purchase the note as their agent, in order to defeat the equities of the Aragon Coffee Company.

It follows that the judgment upon the demurrer should have been in favor of the defendant, and this court will enter such judgment as the Circuit Court ought to have rendered.

*Reversed.*