## HICKMAN v. SAWYER et al.

### (Circuit Court of Appeals, Fourth Circuit. May 26, 1914.)

#### No. 1190.

1. CONTRACTS (§ 93*)—CONSENT—MISTAKE.

One who in the full possession of all his faculties signs a written or printed contract without reading the same, although having full opportunity to do so, cannot impeach it by parol on the ground that he intended to sign something different.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 415–419; Dec. Dig. § 93.*]

2. CONTRACTS (§ 321*)—CONSTRUCTION AND OPERATION—REMEDY FOR BREACH.

When the parties agree upon the remedy which one of them is to have in case of a breach of the contract by the other, that remedy is exclusive.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1508–1527; Dec. Dig. § 321.*]

3. SALES (§ 38*)—VALIDITY OF CONTRACT—FRAUD.

Defendants and one C. formed a partnership for the purpose of purchasing a stallion; defendants being induced to do so by the joinder of C., who was a horse dealer. Defendants gave joint notes for their share of the purchase money, while C. paid his share in cash, which, through a fraudulent agreement with the agent of the sellers, was returned to him. Held, that the fraud rendered the contract voidable by defendants.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 65–77, 85; Dec. Dig. § 38.*]

4. BILLS AND NOTES (§ 525*)—ACTION—BONA FIDE PURCHASER.

Evidence held to sustain the finding of a jury that plaintiff was not a bona fide purchaser of notes sued on from a bank which purchased the same from the payees, but to warrant a finding that he purchased as agent of the payees, who were indorsers, which rendered the action subject to the defense of fraud in the inception of the notes.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1832–1839; Dec. Dig. § 525.*]

5. SALES (§ 360*)—ACTIONS FOR PRICE—DEFENSE OF FRAUD.

In an action on notes given for the purchase price of a stallion which was retained and sold by defendants, although a successful defense was made against the notes on the ground that the sale was induced by fraud, plaintiff was entitled to recover the value of the horse.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1060–1062; Dec. Dig. § 360.*]

Pritchard, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of North Carolina, at Raleigh; Henry G. Conner, Judge.

Action at law by Charles W. Hickman against D. C. Sawyer, John E. Parrisher, J. W. Cahoon, Charles Roughton, H. T. Davenport, L. S. Spruill, and others. Judgment for defendants, and plaintiff brings error. Reversed.

De Witt C. Wilson, of La Fayette, Ind., and I. M. Meekins, of Elizabeth City, N. C. (Wilson & Quinn, of La Fayette, Ind., on the brief), for plaintiff in error.

W. M. Bond, of Edenton, N. C., and E. F. Aydlett, of Elizabeth City, N. C., for defendants in error.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before PRITCHARD and WOODS, Circuit Judges, and ROSE, District Judge.

WOODS, Circuit Judge. The controversy arises out of a contract made April 14, 1908, for the sale of a stallion by J. Crouch & Son, an Indiana partnership, to the defendants, citizens of North Carolina, under the name of the Columbia German Coach Horse Company. The contract of sale contained a guaranty on the part of the sellers that the stallion would be a "satisfactory sure breeder" provided he should be kept in sound and healthy condition and should have proper care and exercise; and it was stipulated by the sellers:

"If the said stallion should fail to be a satisfactory sure breeder with the above treatment, then same shall be returned to us at La Fayette, Indiana, in as sound and healthy condition as he now is and in as good flesh by June 1, 1909, and we agree thereupon to take the said stallion back and to give the said company another stallion in his place."

The contract on the part of the buyers recited the necessity of improving the stock of the country, and contained an agreement by the defendants as subscribers to the association to take shares aggregating $3,000, each of the par value of $300, and when all the shares were sold to give their three joint notes to J. Crouch & Son for $1,000 each, payable November 1, 1909, November 1, 1910, and November 1, 1911, with interest at the rate of 6 per cent. The notes were given April 13, 1908; and after they fell due this action on them was brought December 12, 1911, by the plaintiff, Hickman, claiming to be an indorsee and holder for value without notice. After the testimony was taken the District Judge submitted to the jury the following issues, to which the jury responded as indicated:

"1. Was the execution by D. C. Sawyer, L. S. Spruill, J. G. Brickhouse, W. M. Brickhouse, Charles Roughton, H. H. Phelps, W. R. Spruill, H. T. Davenport, and J. W. Cahoon of the notes sued upon procured by fraud and misrepresentation as alleged? Ans. Yes.

"2. Was the execution by defendants J. R. Parrisher, Benjamin Spruill, W. F. Owens, W. C. Alexander, and E. P. Cahoon of the notes sued upon procured by fraud and misrepresentation as alleged? Ans. Yes.

"3. Was the Merchants' National Bank an innocent purchaser before maturity for value and without notice of Exhibits A and B? Ans. Yes.

"4. Is the plaintiff, Hickman, a purchaser for value of the notes marked Exhibits A and B? Ans. No.

"5. Was plaintiff, Hickman, an innocent purchaser for value and without notice of the note marked Exhibit C? Ans. No.

"6. What amount, if anything, is due the plaintiff by defendants on the notes sued on? Ans. ———."

Upon these findings the District Judge entered judgment for the defendants. It is unnecessary to set out the assignments of error in detail, as the case turns on the question whether the District Judge should have directed a verdict for the plaintiff instead of submitting issues to the jury, and whether he should have given judgment for the plaintiff on the findings of the jury, or should have granted a new trial.

[1] 1. Laying aside for the moment the claim of the plaintiff that he is a purchaser for value without notice, we consider whether there was any evidence of fraud upon the part of J. Crouch & Son in the

contract of sale and the taking of the notes. Some of the defendants testified that McLean, who was the agent of Crouch & Son in the transaction, read the notes to them as if each maker would be liable only to the extent of the par value of the stock subscribed by him, and also indicated in the reading that Combs, who was a horse dealer in Columbia, had signed the notes and become liable along with the others; and Spruill, one of the defendants, testified that he could not write nor read writing, though he signed the notes with his own hand. There was no evidence that McLean knew that Spruill could not read writing, nor does it appear that the notes and contract were written and not printed. The defendants had abundant opportunity to examine the papers, and it was their duty to do so. A court cannot grant relief to one who in the full possession of all his faculties signs a written or printed contract, on the ground that he carelessly failed to even read the paper or make any examination of it, depending upon the statements of someone else as to its contents.

It is true that relief has been granted when persons exercising reasonable diligence have been mislead into signing a paper which had been cunningly substituted for the contract they intended to sign. But this is not a case of that sort. Having every opportunity of seeing and reading the papers, the defendants signed without reading them, and they cannot now be allowed to say by parol that they intended to sign something different, and thus impeach their written contract. Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203; Dellinger v. Gillespie, 118 N. C. 737, 24 S. E. 538; Boyden v. Clarke, 109 N. C. 669, 14 S. E. 52.

[2] 2. If the proof of the failure of the horse to come up to the guaranty as a satisfactory and sure breeder stood alone, it would not be sufficient to protect the defendants against their contract of purchase, because they specially agreed that if the guaranty should fail they would take another stallion from the sellers in place of the one purchased. And it appears that after discovery of the failure of the guaranty they elected to keep the horse without claiming another, and finally sold him for their own benefit. It is well established that, when the parties agree upon the remedy which one of them is to have in case of a breach of the contract by the other, that remedy is exclusive. This rule was applied in the following cases similar to this: Walters v. Akers (Ky.) 101 S. W. 1179; Ohmanns v. Poland (Tex. Civ. App.) 142 S. W. 653; Nave v. Powell, 52 Ind. App. 496, 96 N. E. 395; Crouch v. Leake (Ark.) 157 S. W. 390; Sturtevant Mill Co. v. Kingland Brick Co., 74 N. J. Law, 492, 70 Atl. 732; Bomberger, Wright & Co. v. Griener, 18 Iowa, 477; Chas. Hackley Co. v. Kennedy, 152 N. C. 196, 67 S. E. 488; Ancrum v. Camden Water, etc., Co., 82 S. C. 284, 64 S. E. 151, 21 L. R. A. (N. S.) 1029.

It is true that the remedy in this case is inadequate almost to the point of absurdity, since there was no stipulation whatever as to the quality of the other stallion that was to be given in exchange. But a court cannot on the ground of improvidence substitute other remedies for that which the party himself has contracted to accept.

[3] 3. But the failure of consideration does not stand alone. The deception in the procurement of the contract which we now point out,

and which was relied on by defendants, not only vitiates the contract in its inception, but projects itself into the entire transaction, attaching itself to the failure of consideration and magnifying it into evidence of fraud. The evidence is clear and undisputed that the defendants went into the purchase because of their faith in Combs as a dealer in horses and their reliance on the representation of McLean, the agent of the seller, and of Combs himself that he was joining in the purchase and incurring a common pecuniary risk. In order to deceive the defendants into the belief that Combs had faith in the enterprise and had joined in the venture, and that he would be stimulated to make the business a success, McLean and Combs not only led the defendants into that belief by false oral statements, but, to make sure of the deception, resorted to this artful trick: Combs gave his check for $300 as if in payment of his share of the purchase money of the horse; McLean had the check cashed and then paid the money back to Combs after entering a credit of $100 on each note as if Combs had made that payment on it. Fraud has assumed no more odious form than this. The bargain between McLean and Combs was not only corrupt, but was a breach of trust on the part of Combs participated in by the sellers of the horse. Combs had entered into a partnership with the defendants, thus assuming to them a trust relation which required on his part the utmost good faith and disinterested effort for the common good; and he was corrupted by the agent proposing to sell to the association to act in the sellers' interest by inducing the association to make the purchase. For such a nefarious bargain between the seller and one pretending to act in association with the buyers, the buyers may avoid the entire contract. The authorities on this subject are so numerous that only a few are cited. Empire State Ins. Co. v. American Central Ins. Co., 138 N. Y. 446, 34 N. E. 200; Truslow v. Parkersburg, etc., R. Co., 61 W. Va. 628, 57 S. E. 51; De Buesche v. Alt, L. R. 8 Chan. Div. 315; Emmons v. Alvord, 177 Mass. 466, 59 N. E. 126; 31 Cyc. 1572.

It is true that if the buyer would rescind he must return the article purchased as soon as the fraud is discovered, but if the article has been disposed of, or for any other reason the return has become impossible before discovery of the fraud, the buyer may sue for damages for the imposition or may set them up as a counterclaim in an action brought by the seller for the purchase money. The usual measure of damages in such case would be the difference between the real value of the article purchased and the purchase price. May v. Loomis, 140 N. C. 350, 52 S. E. 728; 35 Cyc. 149.

In this case there was no proof whatever that the defendants knew of the corrupt bargain between Combs and McLean until after they had disposed of the horse, and hence had this been a suit on the notes brought by Crouch & Son the recovery could not exceed the real value of the horse sold.

This conclusion as to the rights of the defendants as against Crouch & Son is not affected by the terms of the guaranty providing that in case the horse should not turn out as represented the purchasers should return him and take another in its place. For this stipulation for the

acceptance of another horse related only to the failure of consideration; it had no relation to fraud in the inception of the contract and provided no remedy for it. Indeed, as between the parties the written guaranty along with every other incident of the contract of sale was vitiated by the fraud.

[4] 4. We consider next whether there was such a preponderance of evidence that the plaintiff was a bona fide purchaser for value without notice before maturity of the third note indorsed by Crouch & Son to him, that the District Judge should have so held without submitting the issue to a jury. In North Carolina when a negotiable instrument has been obtained by fraud, the law lays the burden on the holder to prove by a preponderance of the evidence that it was indorsed to him for value, in good faith, before maturity. Third National Bank v. Exum, 163 N. C. 199, 79 S. E. 498; American National Bank v. Fountain, 148 N. C. 590, 62 S. E. 738. In this instance, the plaintiff testified that the last note maturing on November 1, 1911, was so indorsed to him. But this is utterly inconsistent with the fact that, a year and a half before he acquired this note, he had sued on the note which matured November 1, 1909, which had been transferred to him by the bank, and the defense of fraud in procuring its execution had been set up. As both notes related to the same transaction, it is obvious that the defense of fraud set up to the first note furnished good reason to submit to the jury the issue of notice to the plaintiff of fraud in procuring the execution of the third note, and that their finding on that issue is well supported.

5. There is more difficulty as to the issue submitted whether the plaintiff, Hickman, was a "purchaser for value" of the two notes which had been previously indorsed to the American National Bank; the fact being, as found by the jury, that the bank was an innocent purchaser of the notes before maturity. If after maturity Hickman purchased from the bank, the innocent holder, he would be entitled to recover, although at the time of his purchase he had notice of the vice in the original transaction. This is on the principle that want of notice to the first indorsee confers upon him the right to collect or transfer the instrument, and with the transfer goes the first indorsee's own right of action. If this were not so, the value of negotiable instruments in the hands of bona fide indorsees before maturity would be impaired. Montclair v. Ramsdell, 107 U. S. 159, 2 Sup. Ct. 391, 27 L. Ed. 431; Aragon Coffee Co. v. Rogers, 105 Va. 51, 52 S. E. 843, 8 Ann. Cas. 623; Kost v. Bender, 25 Mich. 515; Glenn v. Farmers' Bank of N. C., 70 N. C. 191; 7 Cyc. 938. Nor would it make any difference if the innocent purchaser chose to transfer the instrument for a nominal consideration, all his rights would nevertheless go to his assignees. If therefore Hickman himself was really the purchaser from the bank, the inquiry whether he paid value was entirely immaterial.

The real question made by the evidence was not whether there was a formal transfer by the bank to the plaintiff for value received from him therefor, but whether in that transaction the plaintiff was representing himself or Crouch & Son. The testimony of the officers of

the bank supports that of the plaintiff that he paid the money, and that the bank transferred the notes in consideration of the payment. As the bank had paid full value for the notes, it is inconceivable that it would have assigned them without value. There is no doubt that, if the plaintiff was the assignee at all, he was an assignee for value. The evidence leaves no room for controversy on that point. Hence it could make no difference that the fourth issue submitted presented the inquiry whether Hickman was a purchaser for value, for the real question was not as to the payment of value but whether he was himself a purchaser at all. The form of the inquiry might have been more definite in asking directly whether Hickman purchased and paid the money for himself or as the representative of Crouch & Son; but the inquiry whether Hickman was a purchaser opened and included the issue whether he represented himself or Crouch & Son, and that is the crucial question which the jury answered against the plaintiff in their response to the fourth issue.

Hickman testified that he had never been in North Carolina, and knew nothing of the responsibility of the makers of the note; that he could not remember how he found out that the bank had these overdue papers; and that under these circumstances he bought the notes as an investment, intending to incur the expense of suit, although the notes made no provision for attorney's fees. But what is still more significant, he testified that he had never made any demand on Crouch & Son, and that the law of Indiana required him to exhaust the makers before making demand on the indorsers; that he had never mentioned the notes to Crouch & Son, and had never notified them of nonpayment; and that he had no understanding with Crouch & Son to reimburse him for expenses. It is significant, too, that no witness, not even a member of the firm of Crouch & Son, testified in support of this extraordinary story.

The extreme improbability of this statement is strong evidence against it. The inference that Hickman was acting for Crouch & Son was, under the circumstances, a fair and reasonable inference for the jury to draw. Looking backward to the beginning of the transaction, the inference of duplicity and false pretense as to the ownership of the notes is greatly strengthened by the undisputed duplicity of Crouch & Son when they corrupted Combs, the pretended associate of the defendants. Crouch & Son were bound to take up the notes when they were dishonored, and it would be disregarding the obvious to say the evidence does not warrant the conclusion that the plaintiff paid the bank at their instance and as their agent. It is incredible that the plaintiff or any other reasonable man with no inducement but investment would have taken up the notes for himself or any one else but Crouch & Son, the indorsers. If Hickman did purchase the notes for Crouch & Son, as is implied by the finding of the jury, then they are the beneficial owners of the notes and against them and Hickman, their representative, the defense of fraud must prevail. We conclude that there was no error in refusing to direct a verdict and that the answers to all the issues submitted to the jury were well supported by the evidence.

[5] Nevertheless, the judgment of the District Court in favor of the defendants cannot stand, because under the evidence offered the plaintiff was without doubt entitled to recover the value of the horse. It is true that the answer sets up the expense of maintaining the horse as a loss to the defendants because of the seller's fraud; and mention is made of this claim in the argument; but no evidence was offered at the trial in support of it. It may be if there had been evidence on the point that it would have been the duty of the District Judge to submit an issue of the amount of this expense, and whether the seller's fraud caused the useless expense, under the principle laid down by the United States Supreme Court in Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113. But as that question is not before us, we express no opinion upon it.

As against Crouch & Son, the plaintiff is the legal owner and holder of the notes; as against the defendants, he stands in the shoes of Crouch & Son and is entitled to recover just what they would be entitled to recover had they sued on the notes. 2 Daniel on Neg. Ins. § 1192; note to Stewart v. Price, 64 L. R. A. 599; 30 Cyc. 78.

For this reason the judgment must be reversed and the cause remanded to the District Court for a new trial of an issue as to the real value of the horse, and of any other relevant issue made by the pleadings upon which evidence may be offered and which has not already been determined by the findings on the first trial.

Reversed.

PRITCHARD, Circuit Judge (dissenting). It is with reluctance that I dissent from some of the conclusions of the court in this instance.

The principal allegation in the plaintiff's complaint is to the effect that these defendants were induced to sign the notes in question by the false and fraudulent representations of Combs and McLean, as to the extent of liability they would incur by signing the same. In other words, this appears to have been the main defense relied upon by the defendants in the court below; the two first issues being as to whether the execution by the defendants of the notes sued upon was procured by fraud and misrepresentation, both of which were found in favor of the defendants. However, I heartily concur in the conclusion reached in the leading opinion as to this contention, which is to the effect that:

"Having every opportunity of seeing and reading the papers, the defendants signed without reading them, and they cannot now be allowed to say by parol that they intended to sign something different, and thus impeach their written contract."

Such being the case, can the defendants, in view of the facts, avail themselves of the further plea that they were induced to execute the notes in question by reason of the false and fraudulent representations of McLean acting as the agent of J. Crouch & Son in the sale of the horse? In other words, inasmuch as the defendants retained the horse and did not rescind the contract, are they not estopped thereby

from setting up the alleged fraudulent conduct of Crouch & Son's agent as a defense to this action?

Crouch & Son delivered the horse in pursuance of their agreement, and the purchasers received, retained possession of, and sold the same for a valuable consideration which they retained, and now seek to repudiate the liability which they assumed when they signed the notes. They could have rescinded the contract when they discovered that the horse was not as represented, but this they failed to do.

It is well settled that, where one seeks to avoid liability under a contract on account of fraud, he must do so by rescinding the same at the earliest possible moment after the fraud is discovered. In this instance the defendants in their answer admit that they did not return the horse as required by the express provisions of the warranty.

As said by the Supreme Court in Shappiro v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419:

"It is well settled by repeated decisions of this court that, where a party desires to rescind upon the ground of misrepresentation or fraud, he must, upon the discovery of the fraud, announce his purpose and adhere to it. If he continues to treat the property as his own, the right of rescission is gone, and the party will be held bound by the contract. * * * If he choose the latter remedy (to rescind), he must act promptly—'announce his purpose and adhere to it,' and not by acts of ownership continue to assert right and title over the property as though it belonged to him."

The same rule is announced in the following cases: Hill v. Railroad Co., 143 N. C. 539, 55 S. E. 854, 9 L. R. A. (N. S.) 606; Clements v. Insurance Co., 155 N. C. 57, 70 S. E. 1076; Masson v. Bovet, 1 Denio (N. Y.) 69, 43 Am. Dec. 653; Richardson v. Lowe, 149 Fed. 625, 79 C. C. A. 317.

It should be borne in mind that at the time the notes in question were signed J. Crouch & Son executed a guaranty in the following language:

"Nashville, Tenn., April 14, 1908.

"Guaranty on the German Imported Coach Stallion, Stepper No. 4327.

"We have this day sold the imported German Coach Stallion named Stepper, No. 4327, to the Columbia German Coach Horse Company, Columbia, N. C., and we guarantee the said stallion to be a satisfactory sure breeder, provided the said stallion keeps in as sound and healthy condition as he now is and has proper care and exercise. If the said stallion should fail to be a satisfactory sure breeder with the above treatment, then same shall be returned to us at Lafayette, Indiana, in as sound and healthy condition as he now is and in as good flesh by June 1st, 1909, and we agree thereupon to take the said stallion back and to give the said company another in his place.

"J. Crouch & Son,
"Columbia German Coach Horse Co.

"Accepted: S. M. Combs, Sect.
"Duplicate."

This warranty or agreement was as much a part of the contract between the parties as the notes, and must be construed in connection therewith in order to determine what relief the defendants were to have in the event the horse should prove to be worthless. This agreement clearly expressed the terms of the contract in which there is provided a remedy in case there should be a breach of the same.

There being no other provision contained therein by which the defendants could be compensated should the horse prove to be unfit for the purpose for which he was purchased, the remedy thus afforded was exclusive.

A warranty somewhat similar to the one in this case was passed upon in the case of Walters v. Akers (Ky.) 101 S. W. 1179. The court in that case, among other things, said:

"There was no mistake or fraud in the written contract of warranty entered into between Vannort and Crouch & Son, and this writing contained the entire contract between them, and by its terms each of the parties to it must abide. ＊ ＊ ＊

"Contracts containing provisions similar to this have been before this court in a number of cases, and it has uniformly been ruled that, when the parties to a contract agree upon the remedies that accrue for a breach of it, these remedies constitute the only relief in this particular that the purchaser has, and he must look to his contract and be governed by its stipulations."

Also in the case of Oltmanns Bros. v. Poland, 142 S. W. 653, the Texas Court of Appeals in discussing this phase of the question said:

"2. The gist of this case is the proper construction of the warranty given by Oltmanns Bros., and appellee's rights thereunder, as shown by the undisputed facts of this case. It is a rule of the common law in the sale of chattels that a sound price warrants a sound article; and where a purchase is made without any special warranty, if the article proves unfit for the purpose for which it was sold, the purchaser may return the same and demand a return of the purchase money, or he may keep the article and recover as damages the difference between the value of the article as represented by the implied warranty and its real value. If he seeks a rescission of the contract, he must return the article purchased. Stewart v. R. R. Co., 62 Tex. 248, 249; Milligan v. Ewing, 64 Tex. 260; Coddington v. Wells, 59 Tex. 50. But in the sale of personal property, as in all other transactions, the seller has a right to define his liability by a special warranty, and provide for the measure of damages or the manner of fulfilling his warranty. This was done in this case by Oltmanns Bros. The guaranty provides that, 'if the said stallion fails to be a satisfactory and sure breeder, with the above treatment, we agree to take the said stallion back and give to said company another ＊ ＊ ＊ at our barns in as sound and healthy condition as he now is, by April 1, 1908.' "

Also in the case of Crouch & Son v. Leake et al., 157 S. W. page 390, the Supreme Court of Arkansas, in passing upon a warranty almost identical with the one now under consideration, among other things, said:

"The written contract expressed the terms of the warranty and provided the remedy that should accrue from a breach of it, which was exclusive of any other mode of compensation and afforded the only relief to which they were entitled. Not having complied with the said condition on their part, nor shown a waiver thereof on the part of appellants, they will be held to have accepted the stallion as in all respects complying with the warranty and are bound to the payment of the balance due on the note for the purchase money Hightsmith v. Hammonds, 99 Ark. 400 [138 S. W. 635]. See, also, Walters v. Akers (Ky.) 101 S. W. 1179; Wilson v. Nichols & Shepperd Co. [139 Ky. 506] 97 S. W. 18."

It is held by a majority of the court in this instance that the deception practiced by Combs in the procurement of the contract projects itself into the entire transaction, "attaching itself to the failure of consideration, and magnifying it into evidence of fraud; that the

evidence is clear and undisputed; that the defendants went into the purchase because of their faith in Combs as a dealer in horses, and their reliance on the representations of McLean, the agent of the sellers, and of Combs himself that he was joining in the purchase and incurring a common pecuniary risk."

While the conduct of Combs in entering into a secret agreement with McLean was not in the least commendable, we think that when all the circumstances of this case are considered it cannot be reasonably contended that he said or did anything calculated in the slightest degree to mislead the defendants as to the character of the horse they were about to purchase. The injury these defendants sustained was due to the fact that the horse did not prove to be "a satisfactory sure breeder," as represented by J. Crouch & Son in the written guaranty that was delivered to the defendants at the time the notes in question were signed.

The fact that Combs was willing to take a one-tenth interest in the horse in consideration of any services he might render is in itself sufficient to repel the presumption that he had any knowledge of the fact that the horse was not in all respects as represented by J. Crouch & Son.

There is nothing in the record to show that these defendants were, by the false and fraudulent representations of Combs, precluded from making such inquiries as may have been necessary to ascertain the truth as to the qualities of the horse.

The court below submitted an issue as to whether the Merchants' National Bank was an innocent purchaser before maturity for value and without notice of the two notes referred to as Exhibits A and B, and in response to this issue the jury answered in the affirmative. The court also submitted an issue as to whether the plaintiff was a purchaser for value of these notes, and to this issue the jury responded in the negative. Then there was an issue submitted as to whether the plaintiff was an innocent purchaser for value and without notice of the note referred to as Exhibit C (this note having been purchased from J. Crouch & Son according to the testimony of the plaintiff before maturity for value and without notice), and the jury responded in the negative as to this issue.

Even if the defendants were not estopped from interposing the plea of fraud to plaintiff's right of recovery, and were able to establish such plea, nevertheless the court below should have instructed the jury that the plaintiff was entitled to recover on the first two notes in question, inasmuch as the jury found that the Merchants' National Bank was an innocent purchaser before maturity for value and without notice of these notes. The jury having found that the bank was an innocent purchaser before maturity for value and without notice, it follows as a matter of law that the plaintiff, to whom these notes were transferred, was also an innocent purchaser, standing as he did in the shoes of the bank, invested with all the rights that the bank would have had, had it retained these notes and instituted suit upon the same. In other words, the plaintiff having purchased the notes of the bank under these circumstances, he would be entitled to re-

cover, notwithstanding the fact that at the time of the purchase he may have had knowledge of the fraud in connection with the original transaction.

Under the decisions of the Supreme Court of North Carolina it has been held that the appellate court in the exercise of its discretion may in granting a new trial determine whether the trial in the court below should be restricted to one or more of the issues passed upon by the jury, in the first instance. In a personal injury suit (Tillett v. Railway, 115 N. C. 663, 20 S. E. 480), the court in disposing of the case said:

"The findings upon the third and fourth issues must therefore be set aside and a new trial granted as to the questions involved in those two, leaving the verdict upon the other issues undisturbed."

Also in the case of Nathan v. Railway, 118 N. C. 1070, 24 S. E. 511, the court said:

"In the case of Tillett v. Railroad, supra, the ruling in the same case when formerly before the court on appeal (115 N. C. 662, 20 S. E. 480) was reaffirmed, and it was held, as in many cases previously decided, to be within the sound discretion of the appellate court to determine whether a new trial should be restricted to one or more or all of the issues passed upon by the jury. Cites Holmes v. Godwin, 69 N. C. 467; s. c., 71 N. C. 309; Burton v. Railroad, 84 N. C. 201, 192; Boing v. Railroad, 91 N. C. 199; Lindley v. Railroad, 88 N. C. 547."

Therefore, in the exercise of a sound discretion, this court should, in my opinion, hold that the third issue should not be disturbed, and when the case is sent back for a new trial the lower court should be directed to enter judgment in favor of the plaintiff for the amount of the two notes in question.

It would be a needless waste of time to have the jury again pass upon these questions, inasmuch as the evidence offered in the court below to the effect that the bank was an innocent purchaser was uncontradicted. However, it is insisted in the principal opinion that Hickman, in the purchase of the first two notes, was acting as the agent of J. Crouch & Son. A careful examination of the record fails to disclose any evidence from which it might be inferred that in the purchase of these two notes from the bank the plaintiff was only acting as a "dummy" or as the agent of Crouch & Son. There is certainly nothing in the pleadings that would have justified the submission of an issue of this character, nor could the jury have considered this theory in view of the pleadings and the issues based thereon. In other words, in order to enable the defendants to avail themselves of the defense suggested in the principal opinion, it would be necessary to amend the pleadings so as to set up an entirely new and distinct defense to this action, which I think should not be done in a case like this where the issues have been fairly submitted under the pleadings, and the defendants have had an opportunity to present what they originally conceived to be their defense to this action.

Were it not for the fact, as I have stated, that the defendants are estopped from setting up the plea that they were induced to sign the notes in question by the false and fraudulent representations of McLean, and it therefore becomes immaterial as to whether the plaintiff

was or was not an innocent purchaser for value without notice of these notes, I would be inclined to concur with the majority of the court in holding that there is sufficient evidence to justify the jury in finding as they did in response to the fourth issue that the plaintiff was not an innocent purchaser of the note referred to in the fifth issue.